SOLOMON M. WEBSTER *vs.* ROBERT PECK.

The statute of 1861 provides that whenever an execution shall be levied upon any personal property in its nature perishable, or upon live stock the custody and preservation of which would be expensive, the same shall be sold by the officer at the expiration of seven days, instead of twenty-one days as provided by the general law concerning sales on execution. Held that the term *perishable,* as here used, means *subject to natural and speedy decay.*

A liberal construction has been given to the same term in the statute of 1828, (Rev. Stat., tit. 1, § 23,) which provides for the sale of perishable property attached, and it has been regarded as embracing property liable to material depreciation in value, but there is no reason for giving that latitude to the term under the act of 1861, where the time provided for by the general law is too short to admit of any serious depreciation in property taken on execution.

Under the act of 1861 the term *expensive,* as applied to live stock levied on, means *that which would require expense,* and is applicable to the ordinary keeping of animals. Where therefore an officer has in his charge live stock, the keeping of which will require an expenditure for which he will have a right to charge, he must sell at the end of seven days. If the property is receipted to be forthcoming at the sale, or the keeping is provided for by either of the parties, so as to involve no expense chargeable to the property, he must sell at the end of twenty-one days as in other cases under the general law.

The rule of law that the retention of possession of personal property by the vendor is conclusive evidence of a colorable sale, is a rule of policy, required for the prevention of fraud, and is to be inflexibly maintained.

The case found that a vendor of a horse, a week after the sale, hired the horse of the vendee, and was "using him to all appearance as his own in the same manner as before the sale," but that the horse had been delivered at the time of the sale to the vendee and that "the subsequent hiring was the consequence of an unexpected emergency in the vendee's business." Held that the letting of the horse to the vendor was to be regarded as a restoration of possession, and that the sale could not be sustained against an attaching creditor consistently with an inflexible adherence to the settled rule of law.

TROVER, for a horse, wagon and harness; tried to the jury in the superior court on the general issue, with notice, before *Seymour, J.*

On the trial it was proved that the horse in dispute, until the sale of it to the plaintiff, had for several years been owned by Guy Webster, the plaintiff's brother. The plaintiff purchased it of him on the 29th of September, 1861. The sale was made in Woodbury, and the horse was thereupon delivered to the plaintiff, who took it to his home in Northfield, and retained the possession of it about one week. At the ex-

piration of that time the plaintiff let the horse to Guy, and while so hired, and in the possession of Guy under the hiring, it was attached by the defendant upon a debt against Guy as his property. This attachment was made in good faith, without any knowledge on the part of the creditor or officer of any change of title, and while the horse was being used by Guy to all appearance as his own, in the same manner that he had been prior to the sale. The defendant claimed that in view of the short period of the plaintiff's possession, and the subsequent resumption of it, the change of possession was merely colorable, and that the sale ought in law to be declared fraudulent and void. The court found that the sale was in fact *bona fide*, and for full value, and that there was no understanding at the time of the sale that the possession should go back into the hands of Guy, but that the subsequent hiring of the horse was the result of an unexpected emergency in the plaintiff's business; and on these facts the court decided that the sale was not as matter of law or of fact fraudulent and void. The officer proceeded to sell the property under the execution issued upon the judgment obtained in the attachment suit. The sale was in point of form legal and regular, except that it was posted to be sold, and was sold at the end of twenty-one days from the time of posting, and not at the end of seven days. The officer charged for the keeping of the horse, and its keeping was in fact expensive. Upon these facts the court, as to the horse, found the issue for the plaintiff, and assessed its value as damages, holding, first, that the plaintiff was entitled to the horse as against the defendant's levy, and against the defendant's claim that the sale to the plaintiff was fraudulent, and secondly, that under the statute of 1861, the keeping of the horse being expensive, the proceedings of the officer were irregular in posting and selling at the end of twenty-one days.*

---

* The statute of 1861, here referred to, is as follows :—

" Whenever execution shall be levied upon any personal property, being in its nature perishable, or being live stock the custody and preservation of which would be expensive, the same shall be sold at public vendue, according to the provisions of section 175th of the act to which this is in addition, at the expiration of seven days, instead of at the end of twenty-one days as in said section provided."

The defendant moved for a new trial.

*Cothren* and *Huntington,* in support of the motion, contended that the act of 1861 was not intended to be peremptory, but merely to authorize the officer, if the case seemed to him to require it, to sell live stock levied upon at the end of seven days instead of twenty-one ; and that in this case, where there was so little · property to be sold, and the wagon and harness could be sold only at the end of twenty-one days, the officer was clearly justified in postponing the whole sale until the end of that time, and that it was for the interest of the judgment debtor that such course should be taken. They also contended that the use of the horse by the vendor constituted a restoration of possession, and that the sale was therefore in law fraudulent against creditors ; citing *Burrows* v. *Stoddard,* 3 Conn., 431 ; *Patten* v. *Smith,* 4 id., 450 ; *Swift* v. *Thompson,* 9 id., 68 ; *Talcott* v. *Wilcox,* id., 134 ; *Toby* v. *Reed,* id., 216 ; *State* v. *Weston,* id., 527 ; *Carter* v. *Watkins,* 14 id., 240 ; *Osborne* v. *Tuller,* id., 529 ; *Crouch* v. *Carrier,* 16 id., 505 ; *Kirtland* v. *Snow,* 20 id., 23. ·

*Hubbard* and *Hickox,* contra, cited with regard to the possession of the property, *Farnsworth* v. *Shepard,* 6 Verm., 521 ; and with regard to the sale on the execution, *Owen* v. *Dixon,* 17 Conn., 492, *Pierce* v. *Benjamin,* 14 Pick., 356, and *Smith* v. *Gates,* 21 id., 55.

BUTLER, J. It is conceded that personal property can not be taken and appropriated by a creditor in payment of his debt by levy and sale on execution, unless at every step the course prescribed by law is strictly pursued ; and it is therefore apparent that if the court below was right in its construction of the act of 1861, the defendant became a wrong doer by selling at the end of twenty-one instead of seven days, and the plaintiff must retain his judgment, whatever we may think of the other point of the defense.

The act of 1861 directs imperatively that certain kinds of property shall be sold at the end of seven days instead of

twenty-one days. It describes the excepted property in the terms used in the act of 1828 which authorises the sale of personal property attached. The description is general and does not distinguish the property with as much certainty as could be desired. It is entirely sufficient in the act of 1828 ; for by the provisions of that act, application is to be made to a judge or commissioner, and his determination is conclusive, and a protection to himself, the officers, and the parties.

It is not to be presumed that the legislature intended to clothe the sheriff or constable with judicial power and protect him by the incidents of that power, and the officer acts as in all other cases at his peril. But it may be assumed that the legislature thought the language, taken in connection with the object and purpose of the law, would furnish a sufficiently certain guide for his conduct, and we must regard that presumption in construing the act.

Two kinds of property are contemplated. First, that which is *in its nature perishable.*

The first appearance of this word " perishable" in our statutes, was in 1782, when a section was added to the statute respecting wrecks, authorizing an immediate sale of the wrecked property if of " a perishable nature." In the statute of 1828 referred to, the words are again used and transposed, but the import is the same. It is believed that the words in this connection did not exist in any other statute till 1846, when they were again used in an act relative to " unclaimed goods and strays." Dr. Webster, when preparing his dictionary, had his attention turned to the word " perishable" as used in our statutes, and he defines it to mean, in such use, " *subject to speedy decay*." Doubtless that was the sense in which it was used in the statute of 1828. The great delay however between the attachment of property on mesne process and obtaining judgment, which attended litigation previous to the reorganization of our judiciary system, and the obvious equity of the law, led to a liberal construction of the statute to advance the remedy, and orders for the sale of property not in its nature perishable, but which would materially *depreciate in value* for other causes, have been quite common.

The only object of the General Assembly was to prevent loss to the parties, and so long as the parties are benefited that liberal construction may be tolerated. But the reason for such liberal construction is not applicable to this law. The change which it makes in the time of posting for sale, fourteen days, is too short for any material depreciation in value, except from natural and speedy decay. Looking to the language used, therefore, in connection with the object and purpose of the law, and the presumed intention of the General Assembly to so distinguish the property as to afford a reasonably safe guide to the officers who are compelled to serve executions, we are satisfied the property intended is that, and that only, which will materially depreciate or be wholly lost by *natural decay* before the expiration of the twenty-one days prescribed in the general law. If then the property be fruit, vegetables, shell or other fish, meats, or other property which will be liable to materially or wholly decay before the end of twenty-one days, it should be posted and sold at the end of seven days.

The remaining kind of property described in the statute is " live stock," the custody and preservation of which would be " expensive." The word " expensive " here is not used in the sense which lexicographers attach to it, but in its popular sense, meaning that which would involve or require expense. There is not such a difference in the expense of keeping different kinds of stock, or different animals of the same kind, or different ones of any kind at different times, as to justify any other construction. The General Assembly meant to save all unnecessary expense for the benefit of the plaintiff, if required for the satisfaction of his debt, and if not so required for the defendant. If therefore an officer has in his custody live stock, which it will require an expenditure to keep and preserve, and for which he will have a right to charge, he must post and sell at the end of seven days. If the property is receipted to be forthcoming at the sale, or the care and custody is provided for by either of the parties, so that it will involve no expense chargeable to the property, he must post

and sell at the end of twenty-one days, as provided by the general law.

The court below found the fact that the keeping of the horse in question was expensive, and that it was sold at the end of twenty-one instead of seven days, as directed by statute, and properly rendered judgment for the plaintiff.

A consideration of the second point is unnecessary to a determination of the case. But we do not wish, by passing it over, to permit an inference that we intend to relax in the slightest degree the rule that the retention of possession by the vendor is conclusive evidence of a colorable sale. We adhere to it as a rule *of policy*, required for the prevention of fraud, and to be inflexibly maintained. The question therefore, in this and in all cases, must be, not whether there be such a *rule* of law or not, but whether in fact there has been a *retention* of possession, without any delivery at all, or a colorable delivery evidenced by a restoration of the possession. On this point the motion is not as clear as could be desired. It states that Guy Webster, the vendor, was using the horse at the time of the attachment, " to all appearance as his own, in the same manner as he had been prior to the sale." Taken by itself this clearly imports a restoration of possession.. The motion further states that " the subsequent hiring of the horse was the result of an unexpected emergency in the plaintiff's business." But it is not stated what the business or the emergency were, or for how long a period the hiring was. The case presented is not one of *intermeddling* merely ; or of use as a servant or friend of the plaintiff ; or of neighborly or brotherly and temporary loan or accommodation for a single and brief period and purpose ; but of an intentional hiring, which imports an intentional *restoration of possession*, to use " to all appearance as his own, and in the same manner as before the sale." How this would appear if the facts were fully detailed we can not say. But we can not readily conceive of any ordinary emergency in the *business* of a *vendee*, that should justify the restoration of the possession of property to a vendor by *hiring*, within about a week of the sale, to be publicly used by him as before the sale ; or how a sale so

characterized could be sustained against an attaching creditor consistently with an inflexible adherence to the law as heretofore settled in this court. We need only say that the case as stated appears to be one of the class of cases which the rule, as one of policy, and not of *bona fides*, was intended to embrace.

A new trial is not advised.

In this opinion the other judges concurred.